UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| MANUEL PUPO-LEYVAS, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
|     *vs.* | ) | 2:08-cv-00207-JMS-WGH |
| | ) | |
| MARK A. BEZY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, | ) ) | |
|     *Defendant*. | ) | |

**ORDER**

Presently before the Court in this *Bivens* action is Defendant Mark A. Bezy's ("Warden Bezy") Motion for Summary Judgment (the "Motion"). [Dkt. 80.] At all relevant times, Warden Bezy served as the warden of the United States Penitentiary located in Terre Haute ("USP Terre Haute"), and Plaintiff Manuel Pupo-Leyvas was a federal inmate housed at that facility.

A motion for summary judgment asks the Court to rule in favor of the moving party because there is no genuine issue surrounding any material fact and the moving party is entitled to judgment as a matter of law. *Zerante v. DeLuca*, 555 F.3d 582, 585 (7th Cir. 2009) (citing Fed. R. Civ. Pro. 56(c)). When considering a summary judgment motion, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve any doubt as to the existence of a genuine issue for trial against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The non-moving party must do more, however, than just demonstrate a factual disagreement between the parties; it must demonstrate that the disputed factual issue is "material." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

Before the Court details the factual background of this case, it is necessary to remind Mr. Pupo-Leyvas' counsel that upon admission to this Court, counsel certified that "he or she has read and will abide by the Seventh Circuit Standards of Professional Conduct." L.R. 83.5.

Those standards provide, "We will not knowingly misrepresent, mischaracterize, misquote, or miscite facts or authorities in any oral or written communication to the court." Lawyers' Duties to the Court, Seventh Circuit Standards of Professional Conduct, *available at* http://www.ca7.uscourts.gov/Rules/rules.htm#standards.  *See also* Fed. R. Civ. Pro. 11.

On multiple occasions in the brief opposing summary judgment, Mr. Pupo-Leyvas' counsel took significant liberties with the designated evidence to attempt to create facts and inferences that are unsupported by the record. [*See, e.g.*, dkt. 87 at 15 (citing dkt. 87-6 at 25 for the proposition that "officers regularly asked sober inmates to volunteer for breathalyzer tests" when the deponent expressly stated that the officer "didn't say that"); dkt. 87 at 20-21 (citing dkt. 87-21 at 5 for the assertion that "correctional staff regularly ignored BOP and USP Terre Haute policies" when counsel acknowledged at the deposition that he understood that was "not [the officer's] practice"); *see also* footnote 2, *infra* (detailing improper citation to unrelated violent incident to support factual assertion regarding length of Pupo-Leyvas attack).]  This malfeasance required Warden Bezy's counsel to spend four pages on reply painstakingly detailing the unsupported assertions Mr. Pupo-Leyvas' counsel made during briefing.  [Dkt. 90 at 3-7.]  The Court reminds counsel that under no circumstances is twisting the evidence or misrepresenting the record considered advocacy.

### FACTUAL BACKGROUND[1]

**A. Attack on Mr. Pupo-Leyvas**

Mr. Pupo-Leyvas was a federal inmate at the USP Terre Haute from March 2003 through December 2005. [Dkt. 80-1 at 4.]  During an intake screening in March 2005, Mr. Pupo-Leyvas was asked whether there was any reason he should not be placed in general population housing,

---

[1] Unless otherwise noted, the facts that follow are undisputed and thus accepted as true for purposes of this Motion.

to which he responded "no." [Dkt. 80-1 at 31.] Mr. Pupo-Leyvas never requested protective custody or to be placed in the special housing unit. [Dkt. 80-1 at 28-30.]

During an evening in May 2005, Mr. Pupo-Leyvas was in the common area of the E-1 Unit when he heard another inmate call to him from an upper level of the facility. [Dkt. 80-1 at 5, 6.] Mr. Pupo-Leyvas went upstairs and Jose Medina, the inmate who had called him, asked Mr. Pupo-Leyvas to enter a nearby cell. [Dkt. 80-1 at 8, 12.] Mr. Pupo-Leyvas was unafraid and voluntarily entered the cell. [*Id.*] Mr. Medina told Mr. Pupo-Leyvas that he needed to talk to him about something, and another inmate, Mario Lopez, entered the cell. [Dkt. 80-1 at 9.] Mr. Pupo-Leyvas believed that Mr. Medina and Mr. Lopez were intoxicated, although he did not see alcohol in the cell. [Dkt. 80-1 at 9-10.] Mr. Pupo-Leyvas had been housed with Mr. Medina and Mr. Lopez in a different unit the previous year and had never been threatened by either of them. [Dkt. 80-1 at 11-13.]

Mr. Lopez immediately struck Mr. Pupo-Leyvas in the face upon entering the cell. [Dkt. 80-1 at 13.] Mr. Lopez put Mr. Pupo-Leyvas in a chokehold, and Mr. Medina tried to poke Mr. Pupo-Leyvas' eyes. [Dkt. 80-1 at 16-17.] While Mr. Lopez held Mr. Pupo-Leyvas in a chokehold, Mr. Medina removed Mr. Pupo-Leyvas' right eye with his finger. [Dkt. 80-1 at 20.] Mr. Lopez released Mr. Pupo-Leyvas in the doorway of the cell and fled after hitting Mr. Pupo-Leyvas one more time.[2] [Dkt. 80-1 at 21-22.]

---

[2] The parties dispute how long the attack lasted, but an inmate who witnessed the attack testified that it lasted for approximately one minute. [Dkt. 80-3 at 8-9.] The testimony Mr. Pupo-Leyvas cites to support his assertion that the attack lasted seven to ten minutes pertains to *an unrelated attack* that occurred at another USP facility three months before the incident at issue. [Dkt. 87 at 20 (citing Dkt. 90-1 at 12) (discussing an unrelated assault in February 2005 at another Terre Haute facility).] The exact length of the attack, however, is not a material fact for purposes of this Motion.

Mr. Pupo-Leyvas lost consciousness and awoke in a hospital in Indianapolis. [Dkt. 80-1 at 22.] He believes that Mr. Medina and Mr. Lopez attacked him because he "said something" to them about an argument they had with another inmate over changing a television channel. [Dkt. 80-1 at 25.]

### B. Response to the Attack

Mr. Pupo-Leyvas never informed Warden Bezy or any other officers that he feared Mr. Lopez or Mr. Medina before the attack. [Dkt. 80-1 at 29-30.] Correctional Officer Eric Jahn was on duty in the E-1 unit during the attack. [Dkt. 80-2 at 5.] Officer Jahn was in the unit office when he heard a scream and left the office to investigate. [Dkt. 80-2 at 13-14.] When Officer Jahn arrived, he saw inmates fighting in the doorway of a cell on the second floor and called for assistance on his radio. [Dkt. 80-2 at 14-15.] He observed Mr. Lopez holding Mr. Pupo-Leyvas in a headlock and Mr. Medina's thumb in Mr. Pupo-Leyvas' eye. [Dkt. 80-2 at 17-18.] He ordered the men to stop the attack, and they stopped after kicking and punching Mr. Pupo-Leyvas additional times. [Dkt. 80-2 at 19-20.]

Mr. Lopez and Mr. Medina tested positive for alcohol consumption after they were removed from the unit. [Dkt. 87-1 at 11.] Both men were disciplined and separated from Mr. Pupo-Leyvas for the remainder of his incarceration. [Dkt. 80-2 at 22; 80-1 at 31-32.] The Federal Bureau of Investigation investigated the attack. [Dkt. 87-1 at 11.]

### C. USP Terre Haute Policies Regarding Alcohol Prevention

When mixed together and heated, items such as sugar, fruit-based juice, and a yeast base can ferment to form an alcoholic mixture. [Dkt. 80-9 at 9-10.] At the time of the Pupo-Leyvas attack, USP Terre Haute had policies and deterrence mechanisms in place aimed at preventing the production of alcohol, including staff training, periodic rounds, cell searches, pat-downs,

breathalyzers, and discipline for inmate intoxication. [Dkt. 80-1 at 34-35; 80-9 at 4-15.] Additional steps were taken to limit the production of alcohol, including removing washing machines, televisions, and phones from a unit where significant alcohol production was discovered, [dkt. 80-4 at 8], reminding staff to pat down food service workers as they exited the dining hall and to scan them with a metal detector, [dkt. 87-10 at 67; 87-19 at 2], and implementing a new policy further restricting inmate access to sugar and other items used to manufacture alcohol, [dkt. 80-4 at 9-10; 87-19 at 3].

If an inmate was found to be intoxicated, the inmate would receive an incident report, be sanctioned, and be put on a two-year monitoring program. [Dkt. 80-9 at 15.] Warden Bezy was not responsible for administering the alcohol policies. [Dkt. 80-9 at 4.] Administration of these policies, including staff training, was delegated to lower officers. [Dkt. 80-9 at 4-5; 80-8 at 1-2.] Some correctional officers failed to draft incident reports or discipline inmates when they found alcohol in a common area that was not attributable to a specific inmate. [Dkt. 87-11 at 12-13; 87-15 at 9-10; 87-16 at 6; 87-25 at 9.] Additionally, some inmates believed that certain correction officers gave informal resolutions to inmates who had consumed alcohol by ordering them to stay in their cells instead of writing them up and disciplining them. [Dkt. 87-6 at 36.]

On the day of the Pupo-Leyvas attack, the correctional officers on duty conducted at least nine cell searches. [Dkt 87-13 at 25-26; 80-10 at 10-11.] Officer Phillip Ellis conducted four cell searches during his shift and discovered contraband in one of the cells that could be used to make alcohol. [Dkt. 87-13 at 25; 80-10 at 10-11.] Officer Jahn conducted five cell searches during his shift and discovered wine in one of the cells. [Dkt. 87-13 at 26.] He sent the inmates from that cell to the Special Housing Unit to receive breathalyzer tests, notified the lieutenant's office, and wrote an incident report. [Dkt. 80-2 at 7-10.]

## DISCUSSION

### A. Allegations Against Warden Bezy

Mr. Pupo-Leyvas alleges that Warden Bezy "could have prevented this assault, but failed to do so by deliberately ignoring obvious risks to inmates at the USP Terre Haute from the rampant alcohol abuse and concomitant violence." [Dkt. 87 at 8.] Mr. Pupo-Leyvas emphasizes that he is bringing a prison conditions claim against Warden Bezy because "[h]ad Bezy taken reasonable measures to control the rampant alcohol manufacture, consumption, and sale at the USP Terre Haute—as he was required to do—Pupo-Leyvas would not have been assaulted."[3] [*Id.*]

Mr. Pupo-Leyvas brings this action against Warden Bezy pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), alleging that Warden Bezy violated his Eighth Amendment right to be free from cruel and unusual punishment. *Bivens* authorizes the filing of constitutional tort suits against federal officers "in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 636 (7th Cir. 2005). The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). However, "a prison official does not violate the Eighth Amendment every time an inmate is attacked by another inmate. Prisons, after all, are dangerous places often full of people who have demonstrated aggression." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008).

To prevail on a claim based on constitutionally violative prison conditions, Mr. Pupo-Leyvas must show that (1) the conditions in the prison were objectively sufficiently serious so

---

[3] Mr. Pupo-Leyvas sued Warden Bezy in his official and individual capacities. In the Motion, Warden Bezy argues that Mr. Pupo-Leyvas' official capacity clams are barred by the doctrine of sovereign immunity. [Dkt. 81 at 9-10.] Mr. Pupo-Leyvas agrees and "respectfully withdraws his claims against Bezy in his official capacity." [Dkt. 87 at 24.] Accordingly, the Court grants summary judgment in favor of Warden Bezy on Mr. Pupo-Leyvas' claims against Warden Bezy in his official capacity.

that a prison official's act or omission resulted in the denial of the minimal civilized measure of life's necessities, and (2) prison officials acted with deliberate indifference to those conditions. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted).

### B. Personal Involvement

Mr. Pupo-Leyvas concedes that Warden Bezy can only be liable if he personally participated in the constitutional wrongdoing. [Dkt. 87 at 25.] He argues, however, that Warden Bezy personally participated in alleged systemic failures at USP Terre Haute by "failing to maintain a safe and secure institution where inmates and staff did not habitually violate the alcohol policies." [*Id.*]

"A prisoner may not attribute any of his constitutional claims to higher officials by the doctrine of *respondeat superior*; the official must actually have participated in the constitutional wrongdoing." *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996) (citation omitted). An official satisfies the personal responsibility requirement "if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). He "must know about the conduct and facilitate it, approve it, condone it, or [ignore it]. In short, some causal connection or affirmative link between the action complained about and the official sued is necessary . . . ." *Id.* The Seventh Circuit looks with skepticism on claims that wardens ordinarily possess sufficient personal involvement for constitutional liability to attach. *Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir. 1981) ("It is doubtful that a prison warden would be directly involved in the day-to-day operation of the prison . . . such that he would have personally participated in, or have knowledge of, the kinds of decisions that led to [the constitutional violation].").

Mr. Pupo-Leyvas presents no evidence that Warden Bezy facilitated, approved, or condoned the manufacture of alcohol at USP Terre Haute. Instead, the undisputed evidence shows that USP Terre Haute had alcohol prevention policies and that Warden Bezy delegated the day-to-day implementation of those policies to lower officers. [Dkt. 80-9 at 4-5, 80-8 at 1-2.] Although the evidence viewed in the light most favorable to Mr. Pupo-Leyvas shows that some correctional guards may have ignored policies on occasion, there is absolutely no evidence that Warden Bezy did anything to facilitate, approve, or condone ignoring the policies or the manufacture of alcohol at USP Terre Haute.

Mr. Pupo-Leyvas maintains that he is not asserting a *respondeat superior* claim against Warden Bezy, but he is, in fact, trying to hold Warden Bezy liable for the alleged failures of his subordinates. This is not a cognizable theory of recovery in a *Bivens* action. *Antonelli*, 81 F.3d at 1428; *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); s*ee also Iqbal*, 129 S.Ct. at 1955 (Souter, J., dissenting) (noting that the majority opinion "does away with supervisory liability under *Bivens*"). Mr. Pupo-Leyvas has not presented any evidence of the causal link between Warden Bezy and the constitutional deprivation of which he complains. *Gentry*, 65 F.3d at 561. Therefore, Mr. Pupo-Leyvas' claim against Warden Bezy cannot survive summary judgment.

### C.     Deliberate Indifference

Even if Mr. Pupo-Leyvas could establish Warden Bezy's personal involvement in the alleged constitutional violation, Mr. Pupo-Leyvas' claim against Warden Bezy also fails because there is no evidence that Warden Bezy acted with deliberate indifference. Deliberate indiffe-

rence requires Mr. Pupo-Leyvas to establish two elements.  First, he must objectively show that he was incarcerated under conditions posing a "substantial risk of serious harm." *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003).  Second, he must establish that Warden Bezy had knowledge of and disregarded the risk to his safety.  *Id.*

For purposes of this Motion, the Court will assume without deciding that Mr. Pupo-Leyvas has satisfied the first prong of the deliberate indifference inquiry—that he was incarcerated in conditions posing a substantial risk of harm.  The second prong, however, presents a greater challenge to Mr. Pupo-Leyvas because the inquiry is not whether Warden Bezy should have known about safety risks but whether Warden Bezy did know and was deliberately indifferent to those risks.  *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008).  The deliberate indifference standard "imposes a high hurdle for a plaintiff to overcome."  *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002).

Mr. Pupo-Leyvas does not dispute that Warden Bezy was unaware of any specific risk that Mr. Lopez and Mr. Medina posed to Mr. Pupo-Leyvas.  [Dkt. 87 at 33.]  This is an unsurprising concession, considering that Mr. Pupo-Leyvas himself testified that he did not perceive any risk from Mr. Lopez or Mr. Medina when he voluntarily entered their cell without fear the evening of the attack.  [Dkt. 80-1 at 8, 12.]  Mr. Pupo-Leyvas argues, however, that the requisite level of knowledge can be imputed to Warden Bezy because he "knew the alcohol abuse at the institution created such unreasonably dangerous conditions that an inmate was bound to be assaulted and, in fact, inmates frequently were assaulted."  [Dkt. 87 at 33.]

An official cannot escape liability by showing that he was unaware that a specific individual was likely to be assaulted.  *Farmer*, 511 U.S. at 842-43.  In fact, an official's knowledge of a substantial risk may be inferred from the obviousness of the risk.  *Higgins v. Corr. Med.*

*Services of Ill., Inc.*, 178 F.3d 508, 511 (7th Cir. 1999). "Examples of obvious risks involving inmate violence include when a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 519 (7th Cir. 2002).

The evidence designated on summary judgment is insufficient to create an issue of material fact regarding Warden Bezy's knowledge of an obvious risk. Mr. Pupo-Leyvas has designated evidence of only one alcohol-related violent attack that occurred in February 2005—three months before his attack.[4] [Dkt. 87-18.] This is insufficient to show that Warden Bezy had knowledge of an obvious risk because a "plaintiff must demonstrate a pervasive risk of harm; a single incident does not demonstrate deliberate indifference." *James v. Milwaukee County*, 956 F.2d 696 (7th Cir. 1992) (citation omitted). And even if the violent incident that preceded the Pupo-Leyvas attack was sufficient to establish knowledge of a pervasive risk, that attack occurred at a different USP facility and, therefore, is not directly relevant. *See Merriweather v. Marion County Sheriff*, 368 F. Supp. 2d 875, 887 (S.D. Ind. 2005) (rejecting plaintiff's evidence "relate[d] to other section of the Jail" because it was not directly relevant to show an official's knowledge for purposes of deliberate indifference standard).

Finally, even if the Court assumes for the sake of the argument that Mr. Pupo-Leyvas presented sufficient evidence to create an issue of material fact regarding Warden Bezy's knowledge of an obvious risk, the undisputed evidence shows that Warden Bezy did not act with deliberate indifference. Proving deliberate indifference requires more than a showing of negligence

---

[4] Mr. Pupo-Leyvas asserts that there were twenty-two additional "alcohol incidents" during the year preceding his attack. [Dkt. 87 at 13.] He admits, however, that he did not designate documents supporting that assertion "[d]ue to their voluminous nature." [*Id.*] Evidence not designated to the Court cannot be properly argued. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004). Moreover, there is no evidence that those incidents resulted in inmate violence; therefore, they do not establish knowledge of an obvious risk.

or even gross negligence; the officer must have acted with the equivalent of criminal recklessness. *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005); *see O'Malley v. Litscher*, 465 F.3d 799, 806 (7th Cir. 2006) (defining the criminal recklessness standard for purposes of deliberate indifference as "ignoring a known risk"). "Indeed, an officer who actually knew of a substantial risk to a detainee's safety is free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that he was deliberately indifferent." *Id.*

The undisputed evidence shows that USP Terre Haute had alcohol prevention policies in place and that Warden Bezy took action after the February 2005 attack at the other facility to prevent future alcohol-induced violent attacks. [Dkt. 80-4 at 9-10, 87-19 at 3.] That facility was placed on lockdown, the Special Investigative Section investigated the incident, the assailants were placed in the Special Housing Unit and ultimately sanctioned, and the matter was referred to the Federal Bureau of Investigation. [Dkt. 87-18.] Additionally, a new policy was implemented to further restrict inmate access to sugar and other items used to manufacture alcohol. [Dkt. 80-4 at 9-10; 87-19 at 3]. Although Mr. Pupo-Leyvas argues that "[Warden] Bezy's actions were akin to trying to put out a three-alarm fire with a garden hose," [dkt. 87 at 35], the existence or possibility of other policies that could have been used does not establish deliberate indifference, *Butera v. Cottey*, 285 F.3d 601, 608-09 (7th Cir. 2002).[5]

---

[5] Mr. Pupo-Leyvas designated an affidavit from an independent consultant, Mr. Martin, to support his opposition to Warden Bezy's Motion. [Dkt. 87-34.] Warden Bezy filed a Motion to Strike Mr. Martin's affidavit, arguing that it is inadmissible, not based on any articulated theory, methodology, or standards, and contains legal conclusions. [Dkt. 88, 89.] After reviewing Mr. Martin's affidavit, the Court concludes that, at most, Mr. Martin's affidavit establishes that Warden Bezy acted with gross negligence, which is insufficient to establish liability on an Eighth Amendment claim. *Fisher*, 414 F.3d at 662. In other words, Warden Bezy is entitled to summary judgment regardless of the admissibility of Mr. Martin's affidavit. The Court, therefore, denies Warden Bezy's Motion to Strike as moot.

While the Court agrees that preventing inmate-on-inmate violence should be a high priority for prison officials, nothing in the record suggests that Warden Bezy acted with the requisite *mens rea* to be deliberately indifferent to the risks at USP Terre Haute. "[A] prison official does not violate the Eighth Amendment every time an inmate is attacked by another inmate." *Dale*, 548 F.3d at 569. There is no evidence that Warden Bezy ignored a substantial risk of serious harm or acted with deliberate indifference. Therefore, this Court grants summary judgment in favor of Warden Bezy on Mr. Pupo-Leyvas' claims against him in his individual capacity.

## CONCLUSION

The gruesome attack on Mr. Pupo-Leyvas was extremely unfortunate. Although the Court understands his desire to be compensated for his horrific injuries, the undisputed evidence shows that Warden Bezy did not personally participate in any constitutional wrongdoing and was not deliberately indifferent to a substantial risk. Warden Bezy's Motion for Summary Judgment is **GRANTED** as to Mr. Pupo-Leyvas' claims against him in the warden's official and individual capacities. Warden Bezy's Motion to Strike Mr. Martin's affidavit is **DENIED** as moot. Judgment will issue accordingly.

So ordered.[6]

09/03/2010

*[signature]*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

---

[6] Mr. Pupo-Leyvas has also filed a claim against the United States of America under the Federal Tort Claims Act, and that case is docketed as 2:08-cv-00344-JMS-WGH. The Court acknowledges that the United States has moved for summary judgment on Mr. Pupo-Leyvas' claims in that case. The motion remains under advisement.

**Distribution via US Mail:**

David Roy Nelson
Steptoe & Johnson LLP
201 E Washington St
Ste 1600
Phoenix, AZ 85004-2382

**Distribution via ECF only:**

Scott T. Bielicki
STEPTOE & JOHNSON LLP
sbielicki@steptoe.com

Philip J. Fornaci
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS & URBAN
philip_fornaci@washlaw.org

Sarah D. Gordon
STEPTOE & JOHNSON LLP
sgordon@steptoe.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Suzanne Dallas Reider
STEPTOE & JOHNSON LLP
sreider@steptoe.com

James Elmer Rocap III
STEPTOE & JOHNSON LLP
jrocap@steptoe.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov